

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-13-2006

# Benak v. Alliance Cap Mgmt

Precedential or Non-Precedential: Precedential

Docket No. 05-1070

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

## Recommended Citation

"Benak v. Alliance Cap Mgmt" (2006). *2006 Decisions.* Paper 1678.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1678

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-1070

———

PATRICIA BENAK, on behalf of Alliance
Premier Growth Fund

v.

ALLIANCE CAPITAL MANAGEMENT L.P.; JOHN D.
CARIFA; ALFRED HARRISON; MARK D. GERSTEN;
RUTH BLOCK; DAVID H. DIEVLER; JOHN H. DOBKIN;
WILLIAM H. FOUL, JR.; JAMES M. HESTER; CLIFFORD L.
MICHEL; DONALD J. ROBINSON

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 01-cv-05734)
Honorable Jose L. Linares, District Judge[*]

———

Submitted Under Third Circuit LAR 34.1(a)
November 18, 2005

———

[*]By order entered May 10, 2002, the U.S. District Court for the District of New Jersey consolidated the proceedings at Nos. 01-cv-05734, 01-cv-06127, 02-cv-00672, 02-00994, and 02-cv-1385 for all purposes. The caption when the appeal was initially docketed included the captions for all the individual actions. By order dated May 25, 2005, the District Court noted that all plaintiffs' complaints had been dismissed in action No. 01-cv-05734. As such, this opinion shall be captioned in No. 01-cv-05734 only.

Before: BARRY and AMBRO, <u>Circuit Judges</u>, and POLLAK,[**]
<u>District Judge</u>

———————

(Opinion Filed:  January 13, 2006)

———————


James Bonner, Esq.
Shalov, Stone & Bonner
485 Seventh Avenue
Suite 1000
New York, NY 10018

<u>Counsel for Appellants Patrick J. Goggins, Laura H. Goggins,</u>
<u>and Fred B. Voigt</u>

Mark A. Kirsch, Esq.
Clifford Chance US
31 West 52nd Street
New York, NY 10019
        -AND-
Herbert J. Stern, Esq.
Stern & Kilcullen
75 Livingston Avenue
Roseland, NJ 07068

<u>Counsel for Appellees Alliance Cap. Mgmt., John D. Carifa,</u>
<u>Alfred Harrison, and Mark D. Gersten</u>

G. Stewart Webb, Jr., Esq.
Venable
2 Hopkins Plaze
1800 Mercantile Bank & Trust Bldg.
Baltimore, MD   21201

———————————

[**]The Honorable Louis H. Pollak, District Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

-AND-
John L. Hardiman, Esq.
Sullivan & Cromwell
125 Broad Street
New York, NY 10004

Counsel for Appellees Alliance Premier Growth Fund, Ruth Block,
David H. Dievler, John H. Dobkin, William H. Foulk, Jr., James
M. Hester, Clifford L. Michel, and Donald J. Robinson

---

OPINION OF THE COURT

---

BARRY, Circuit Judge

Appellees – Alliance Capital Management L.P. ("Alliance
Capital"), which was the investment advisor to the Alliance
Premier Growth Fund, Inc. (the "Fund"); Alfred Harrison, the
premier portfolio manager of the Fund; and a number of former
directors and officers of the Fund – and appellants, shareholders
in the Fund from October 30, 2000 through November 29, 2001
(the "Class Period"), are before us on appellants' appeal of the
District Court's dismissal of their complaint on statute of
limitations grounds. We will affirm.

## I. Background

During the Class Period, the Fund – a long term capital
growth fund – held and continued to purchase shares of Enron
stock. As of November 30, 2000, the Fund held $157,536,750
worth of Enron stock, as indicated in the Fund's 2000 annual
report to the SEC. (Amended Class Action Compl. ("Am.
Compl.") ¶ 73, A89.) Over the course of the next six months,
the Fund acquired an additional 4,765,800 shares. Apparently,
no Fund report issued between the May 31, 2001 semi-annual
report and Enron's bankruptcy. During that time period,

3

however, concerns about Enron's solvency began to be discussed publicly.

In their amended class action complaint of December 8, 2003, appellants referenced numerous news accounts beginning as early as September of 2000 and accelerating in the late summer and early fall of 2001 regarding Enron's financial health and accounting practices.[1] The end of October and beginning of November brought more specific accounts of trouble at Enron.[2]

---

[1] *See* Am. Compl. ¶ 328 (citing a September 20, 2000 *Wall Street Journal* article questioning an accounting practice of Enron); ¶ 346 ("[T]he public criticism of Enron's financial reporting intensified dramatically following the time Alliance initiated its investment in Enron."); ¶¶ 348-50 ("One prominent article that placed Defendants on notice of Enron's unduly aggressive accounting was a March 5, 2001 article in *Fortune*"); ¶¶ 355-57 (a May 9, 2001 report on *TheStreet.com*); ¶ 359 (a July 20, 2001 article in *TheStreet.com*); ¶ 370 (an August 15, 2001 *Business Week Online* article about the departure of Skilling); ¶ 371 (an August 15, 2001 report by *Off Wall Street*); ¶ 372 (an August 29, 2001 *New York Times* article); ¶ 373 (an August 30, 2001 article in *TheStreet.com*); ¶ 374 (a September 9, 2001 *New York Times* article); ¶ 375 (a September 17, 2001 *Fortune* article); ¶ 377 (an October 1, 2001 article in *Fortune*); ¶ 380-81 (an October 16, 2001 *TheStreet.com* article); ¶¶ 383, 386-87 (articles on October 17, 18, and 19, 2001 in *The Wall Street Journal*); ¶¶ 395, 398 (*TheStreet.com* on October 22, 2001); ¶ 407 (*Wall Street Journal* reports on October 23 that the SEC had begun an inquiry into Enron and its relationships with partnerships overseen by Fastow); ¶¶ 408, 411 (*New York Times* articles on October 23 and 25); ¶ 416 (an October 26, 2001 *Wall Street Journal* article).

[2] *See* Am. Compl. ¶¶ 417, 418, 420, 424, 426, 427, 428, 434, 435, 436, 438, 441.

In addition to press coverage, Standard & Poor lowered Enron's credit rating on November 1, 2001, stating that

> [t]he company's financial flexibility has continued to diminish. This crisis in investor confidence can be traced, in Standard & Poor's view, directly to the company's

Concern continued to heighten as November waned,[3] particularly focused around a proposed acquisition of Enron by Dynegy that fell through in late November.[4] Throughout this period, Alliance's internal analysts gave voice to these concerns.[5]

Enron finally collapsed, filing for bankruptcy on December 2, 2001. In the days immediately following that filing, reports of investors surprised by the collapse and the losses they sustained pervaded the media.[6] Of particular relevance here, Alliance's large stake in Enron was referenced and Fund portfolio manager Harrison was quoted regarding Enron's demise.[7]

---

inability to calm investors that are unsure about the strength of Enron's core energy marketing business and the viability of the company's plan to restore its credit profile.

(Am. Compl. ¶ 425, A182.)

[3]*See, e.g.*, Am. Compl. ¶¶ 444, 447.

[4]*See id.* ¶¶ 446, 453 ("On November 28, 2001, Dynegy cancelled its proposed merger with Enron, thereby making a bankruptcy filing inevitable.").

[5]*See, e.g.*, *id.* ¶¶ 448-51.

[6]*See, e.g.*, A780 (*Washington Post* published article on December 2, 2001 under headline "At Enron, the Fall Came Quickly; Complexity, Partnerships Kept Problems From Public View"); A816 (*International Herald Tribune* article on December 10, 2001 entitled "What to Learn From the Fall of Enron, a Firm that Fooled So Many").

[7]*See* A642 (December 4, 2001 Dow Jones News Service article noting that Harrison "defended his optimism" and "remained bullish on Enron even after Dynegy Inc. (DYN) proposed to acquire it early last month"); A648 (*Wall Street Journal* reports on December 5, 2001 that "Harrison . . . acknowledged that, in retrospect, he missed some warning signs. 'Nobody except very smart short sellers dug into all the footnotes that might have been there.'"); A786 (Dow Jones News Service

Moreover, in the week following Enron's collapse, *The New York Times* reported a potential conflict of interest of an Alliance insider, Frank Savage, who was on the boards of both Alliance and Enron during the relevant period of time.[8] The same day that the *Times* article appeared, Patricia Benak filed a complaint (the "Benak complaint") against Alliance in the U.S. District Court for District of New Jersey, alleging Investment Company Act claims.[9] The complaint in the litigation now before us was initially filed on December 13, 2002 – more than a year after the Enron bankruptcy and the Benak complaint – in the U.S. District Court for the Southern District of New York by Patrick and Laura Goggins (the "Goggins complaint"), and was transferred to the District of New Jersey on August 13, 2003. The factual basis of the Goggins complaint, as subsequently amended, closely tracks that of the Benak complaint.

According to the Goggins complaint, in October and November 2001, as the reports of Enron's worsening financial state increased, appellees continued to invest in the company.[10]

_____

reports on December 4 that Harrison "admitted he had missed repeated signs of trouble at Enron Corp. and kept adding to his already hefty holding in the company until shortly before its collapse became unavoidable"); A787.).

[8]*See* A801 (December 7, 2001 *New York Times* article).

[9]The Benak case, "a consolidated action comprising six derivative lawsuits filed on behalf of the Fund against Alliance Capital," (transfer order, A57), was later dismissed for the insufficiency of its legal claims.

[10]*See* Am. Compl. ¶ 421, A181 ("Harrison's response to this torrent of negative news regarding Enron: he caused the Fund to expend an additional $78,828,905 to purchase Enron shares between October 22, 2001 and October 30, 2001."); ¶ 443 ("Even this obvious train wreck did not deter Harrison from purchasing Enron stock. Between November 13, 2001 and November 19, 2001, he caused the Fund to waste an additional $43,706,333.56 purchasing Enron common stock.").

6

As already noted, media coverage around and after Enron's fall included reference to Alliance's holdings in Enron, and either explicitly or implicitly referenced Alliance's losses.[11] Alliance's continued investment up until Enron's bitter end, despite the negative news accounts and communications to and by analysts at Alliance manifesting concern about Enron's solvency,[12] was the basis for appellants' §§ 11 and 12 claims.[13] Appellants argue that the Fund's publicized claims regarding the type of investment strategies employed and companies invested in were materially misleading in light of the Fund's continued and increasing stake in Enron in the autumn of 2001.

Appellees pointed to the same reports of Enron's financial state to assert their affirmative defense that appellants were on inquiry notice prior to December 13, 2001 – one year before the December 13, 2002 filing of the initial Goggins complaint. They also point to the December 7, 2001 filing of the Benak complaint. In response, appellants argue that information critical to their complaint was not available until after December 13, 2001, in particular, that they had no way of knowing what Alliance's Enron holdings were until they received the Fund's report early in 2002. They also cite a Senate report published in the summer of 2002 that revealed important information about potential relevant conflicts at Alliance, although they did not reference that report in their initial complaint.

The District Court dismissed the Goggins complaint on December 10, 2004. Its opinion reviewed the newspaper

---

[11]*See, e.g.*, A762 (*The Wall Street Journal* reports that, based on the September 30, 2001 filing, the Fund's stake had dropped in value by about $445 million through November 28, 2001); *see also* A805)).

[12]*See, e.g.*, Am. Comp. ¶ 422.

[13]*See id.* ¶ 456 ("Shamefully, only on November 30, 2001, when Enron's bankruptcy was a foregone conclusion, did the Fund sell any of its Enron Stock.") (emphasis in original).

7

accounts and public information cited in the complaint, as well as additional newspaper articles submitted by appellees, and concluded that this information, along with knowledge that the Fund held Enron shares prior to the bankruptcy filing, was more than sufficient to place appellants on inquiry notice prior to December 13, 2001. The Court also referenced the Benak complaint, noting that its early filing was somewhat probative of the information that was available to reasonable investors at the time.

## II. Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291. The District Court dismissed the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Our review of that dismissal, therefore, is plenary. *See Gallo v. City of Philadelphia*, 161 F.3d 217, 221 (3d Cir. 1998). We must accept as true all allegations in the complaint and draw all reasonable inferences from those facts in the light most favorable to plaintiffs – here, appellants. *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989). The dismissal must be upheld "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." *D.P. Enters., Inc. v. Bucks County Community College*, 725 F.2d 943, 944 (3d Cir. 1984). We need not, however, credit "bald assertions" or "legal conclusions." *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005).

## III. Analysis

There is no dispute that the relevant statute of limitations for appellants' claims is "one year after discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e).[14] Appellants filed the initial

---

[14]A statute of limitations defense is an affirmative one, and in order to undergird a dismissal, must appear on the face of the complaint. "A complaint showing that the governing statute of limitations has run on the plaintiff's claim for relief is the most

Goggins complaint on December 13, 2002. The relevant date, therefore, for evaluating appellants' notice of their claims is December 13, 2001.

In dismissing the amended class action complaint, the District Court applied an inquiry notice standard. In *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002), we made it clear that "[t]o the extent a securities fraud plaintiff was on inquiry notice of the basis for claims more than one year prior to bringing the action, his or her claim is subsequently time-barred by the requisite statute of limitations." *Id.* at 1325. "[T]he one-year period begins to run when the plaintiffs 'discovered or in the exercise of reasonable diligence should have discovered the basis for their claim' against the defendant." *Id.* (quoting *Gruber v. Price Waterhouse*, 697 F. Supp. 859, 563 (E.D. Pa. 1988)).

> Whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had "sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity."

*Id.* (adding that the "test for 'storm warnings is an objective one, based on whether a 'reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning'") (citations omitted); *see In re DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508, 513 (D. Del. 2003). Plaintiffs cannot avoid the time bar simply by claiming they lacked knowledge "of the details or 'narrow aspects' of the alleged fraud." *NAHC*, 306 F.3d at 1326 (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 599 (D.N.J. 1997)). Rather, the clock starts when they

---

common situation in which the affirmative defense appears on the face of the pleading and provides a basis for a motion to dismiss under Rule 12(b)(6) . . . ." Charles Alan Wright and Arthur R. Miller, 5B Federal Practice and Procedure § 1357 at 714 (2004).

"'should have discovered the general fraudulent scheme.'" *Id.*
(quoting *Prudential*, 975 F. Supp. at 599); *see Mathews v.
Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 252 (3d Cir. 2001)
("[I]nvestors are presumed to have read prospectuses, quarterly
reports, and other information related to their investments."); *In
re Initial Public Offering Sec. Litig.*, 341 F. Supp. 2d 328, 345
(S.D.N.Y. 2004) ("A plaintiff in a securities fraud case 'is
charged with knowledge of publicly available news articles and
analyst's reports to the extent that they constitute storm warnings
sufficient to trigger inquiry notice.") (citation omitted).

Once defendants establish "storm warnings" in pressing
their affirmative defense, "the burden shifts to the plaintiffs to
show that they exercised reasonable due diligence and yet were
unable to discover their injuries." *Mathews*, 260 F.3d at 252; *see
DaimlerChrysler*, 269 F. Supp. 2d at 513. "Whether the
plaintiffs exercised reasonable diligence is both a subjective and
objective inquiry." *DaimlerChrysler*, 269 F. Supp. 2d at 513
(citing *Mathews*, 260 F.3d at 252). If they have not shown such
diligence, the knowledge they would have acquired through
investigation is imputed to them. *See NAHC*, 306 F.3d at 1326
("'Once on inquiry notice, plaintiffs have a duty to exercise
reasonable diligence to uncover the basis for their claims, and
are held to have constructive notice of all facts that could have
been learned through diligent investigation during the limitations
period.'") (quoting *Gruber*, 697 F. Supp. at 864). In reviewing
the application of the inquiry notice standard in *NAHC*, we
quoted the finding below that the plaintiffs "were at least on
inquiry notice of their claims . . . and, in the exercise of
reasonable diligence, *should have* discovered the basis for the
claims within one year." *Id.* (emphasis added). Plaintiffs
cannot, *post hoc*, excuse a failure to inquire by demonstrating the
difficulty they would have had attaining relevant information.
*See id.* at 1327 ("This Court has previously held that 'excusing
Appellant's lack of inquiry because, in retrospect, reasonable
diligence would not have uncovered their injury . . . would, in
effect, discourage investigation.") (quoting *Mathews*, 260 F.3d at
252 n.16). Therefore, "if storm warnings existed, and the
[a]ppellants chose not to investigate, we will deem them on
inquiry notice of their claims." *Mathews*, 260 F.3d at 252 n.16.

The District Court compared this case to *NAHC* and determined that inquiry notice was clearly established prior to December 13, 2001[15] and that nothing in the complaint demonstrated reasonably diligent efforts to investigate the claims. Although, for the reasons discussed below, this case does not so neatly fit into the paradigm outlined by *NAHC*, we agree that appellants were on inquiry notice of their claims more than one year prior to filing suit.

Undergirding the inquiry notice analysis is the assumption that a plaintiff either was or should have been able, in the exercise of reasonable diligence, to file an adequately pled securities fraud complaint as of an earlier date. In the case of a direct investor – who one would assume has or can be deemed to have consistent knowledge of his or her securities holdings – the storm warning analysis becomes relatively simple. Upon reading news reports regarding the financial woes of a particular company and speculation regarding the management of that company, a direct investor immediately has reason for concern.

---

[15]We review the District Court's decision to take judicial notice of certain facts for abuse of discretion. *NAHC,* 306 F.3d at 1323. We see no basis to upset the District Court's decision to take judicial notice of newspaper articles supplied by appellees. The inquiry notice analysis is an objective one. Whether appellants read the articles or were aware of them is immaterial. They serve only to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true. *Cf. In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003) (*"The Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment."*). Their publication is "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." Fed. R. Evid. 201(b)(2); *see Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) ("We take judicial notice that the market was aware of the information contained in news articles submitted by the defendants.").

11

Moreover, in being responsible for his or her own investments, a direct investor has greater motivation – and therefore, one would assume, be more likely – to stay informed. Upon receiving such information and inquiring further regarding the accuracy of that information, a direct investor – again, knowing the amount and nature of his or her holdings – could file suit almost immediately.

The mutual fund investor is somewhat different. By its very nature, a mutual fund permits an investor to pass along the responsibility for maintaining consistent knowledge of the condition of different companies. Fund investors may have little idea at any one time in what securities their money is invested, a benefit for which they have paid. Appellants, for example, received a report on a semi-annual basis and counsel represented to the District Court that an investor could not receive information on the Fund's holdings between such reports. Appellants' claims are about Alliance's misdeeds and only secondarily about Enron's. *See Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 169 (2d Cir. 2005) ("Storm warnings in the form of *company-specific* information probative of fraud will trigger a duty to investigate.") (emphasis added). Accordingly, a mutual fund investor who sees numerous stories about troubles at his or her *fund* is more akin to a direct investor confronted with reports about a company in which he or she is invested.

Appellees, as one would expect, see things differently. They seize on appellants' citations to numerous news articles regarding Enron in the months leading up to the bankruptcy, claiming that the publicity placed them on sufficient notice of their claims long before December 13, 2001.[16] The question of

---

[16]It is worth noting that appellants' potential knowledge of Fund holdings in Enron – something relied on by appellees in making their inquiry notice argument – could actually *delay* inquiry notice. If appellants did know that the Fund was continuing to acquire Enron stock, that itself could be interpreted, in light of what the Fund told them about their investment strategy, as a reassuring statement. *See id.* ("Reassurances can dissipate apparent

knowledge in the context of this case, however, is not symmetrical. Appellees are mutual fund advisers who are responsible for making investment choices on behalf of the Fund's investors. Appellants make a compelling argument that, as "passive" mutual fund investors, they cannot be held to the same notice standards as the appellees entrusted with their money.

In our estimation, the earliest a reasonable mutual fund investor would have been on inquiry notice is at the time of, or in the days immediately following, the Enron bankruptcy filing. The articles leading up to the bankruptcy primarily report the difficulty analysts were having determining what was happening at the company. Speculation should not be given the same weight as reports of objective wrongdoing. *See Berry v. Valence Tech., Inc.*, 175 F.3d 699, 704 (9th Cir. 1999) ("A press article's general skepticism about a company's future prospects is not sufficient to excite inquiry into the specific possibility of fraud."). Where, as here, the "bulk of the articles . . . generally consisted of rampant speculation," *DaimlerChrysler*, 269 F. Supp. 2d at 515, a court should give them less weight in the analysis. Interpreting speculation and weighing its relevance is one of the important reasons for having a fund manager.

News reports are not given weight by courts in a vacuum, but rather have significance in cases where "investors are presumed to have read prospectuses, quarterly reports, and other information related to their investments." *Mathews*, 260 F.3d at 252.[17] Here, those materials would be those issued by Alliance, not Enron. Therefore, in refining an approach to the storm warnings analysis in the mutual fund setting, there should be a

---

storm warnings 'if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns.'"). Once Enron goes bankrupt, things of course change.

[17]We have been careful not to look at the articles from the perspective of what we now know about Enron. Enron, after all, had yet to become *Enron*. What we have since learned should not obscure the fact that many persons were surprised by Enron's fall.

distinction drawn between news reports regarding a primary investment vehicle – here, the Fund – and those concerning a secondary relationship – Fund resources flowing to Enron. *See Lentell*, 396 F.3d at 169 ("Pleading with sufficient particularity may be especially difficult with claims against a 'secondary' or 'tertiary' wrongdoer (as opposed to an issuer or its officers and directors)."); *Levitt v. Bear Stearns & Co., Inc.*, 340 F.3d 94, 103 (2d Cir. 2003).

As of the date of the bankruptcy, for the reasons already explained, a Fund investor would have to take an additional step to determine whether he or she was injured by Enron's collapse. There is a difference, in our view, between storm warnings showing that a company is in trouble and public reports regarding a fund's holdings that would enable one to know whether he or she is invested in the troubled company (a fact a direct investor always would be deemed to know). *See Mathews*, 260 F.3d at 251 ("[I]n most securities fraud actions, the plaintiffs' injuries are inextricably intertwined with defendants' misrepresentations. Discovery of one leads almost immediately to discovery of the other.").[18] In short, the reasonable mutual fund investor arguably has less reason to monitor the health of companies in which he or she is invested and is less likely to have accurate contemporaneous information regarding where his or her money is invested. Both of these distinguishing features inform the inquiry notice analysis here, where we are not confronted with "a fraud that can be apprehended 'simply by examining . . . financial statements and media coverage' of the issuers." *Lentell*, 396 F.3d at 169 (citations omitted).

Where, as here, however, the knowledge gap is bridged by media accounts noting the mutual fund's holdings in the defunct company, notice is triggered. Accordingly, although we cannot say that inquiry notice was triggered as a matter of law

---

[18]This observation was made in the context of contrasting many RICO cases from the typical case arising out of securities fraud. *Mathews*, 260 F.3d at 251.

prior to Enron's bankruptcy, appellants were surely on notice shortly thereafter. Therefore, despite our refining of the analysis, we reach the same conclusion as reached by the District Court. The combination of appellants' knowledge that Alliance had Enron holdings as of the prior summer, the news reports regarding Enron in the fall of 2001, the company's highly-publicized bankruptcy, the publicity in the immediate aftermath of the bankruptcy referencing Alliance's Enron-related losses,[19] and the filing of the Benak complaint[20] placed appellants on inquiry notice prior to December 13, 2001.

## IV. Conclusion

The December 10, 2004 order of the District Court will be affirmed.

---

[19]"[T]here was ample evidence in the public domain that the Fund was losing hundreds of millions of dollars as a result of its ill-considered Enron investment. As discussed, articles in the Wall Street Journal, the Houston Chronicle, the San Francisco Chronicle, and the New York Post reported that the Fund had incurred paper losses ranging from $445 million to over $1 billion. . . ." (District Ct. Op. at 11, A45).

[20]We need not assess the factual sufficiency of that complaint, nor whether its substance is appropriately considered in making an objective inquiry. It simply serves, as the post-bankruptcy articles about Alliance's holdings serve, as a public event connecting the downfall of Enron with Alliance's investment strategies. *See Initial Public Offering*, 341 F. Supp. 2d at 349 ("The filing of related lawsuits can suffice to put plaintiffs on inquiry notice, where the alleged fraud is similar.").