

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-2008

# In Re: Merck & Co

Precedential or Non-Precedential: Precedential

Docket No. 07-2431

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

## Recommended Citation

"In Re: Merck & Co " (2008). *2008 Decisions.* Paper 451.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/451

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

Nos. 07-2431, 07-2432

————

IN RE: MERCK & CO., INC. SECURITIES,
DERIVATIVE & "ERISA" LITIGATION
(MDL No. 1658)

CONSOLIDATED SECURITIES LITIGATION

Richard Reynolds, Steven LeVan, Jerome Haber and
The Public Employees' Retirement System of Mississippi,
the Court-Appointed Lead Plaintiffs and Plaintiffs Union
Asset Management Holding AG, Loren Arnoff,
Robert Edwin Burns, Jan Charles Finance S.A.,
Martin Mason, Frank H. Saccone, Charlotte Savarese,
Joe Savarese, Joseph Goldman, Sherrie B. Knuth,
Joseph S. Fisher, M.D., Naomi Raphael,
Rhoda Kanter, Park East, Inc. and Marc Nathanson, on behalf
of themselves and the proposed class of purchasers of Merck
securities during the period between
May 21, 1999 and October 29, 2004,

Appellants

————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 05-cv-01151, 05-cv-02367)
District Judge: Honorable Stanley R. Chesler

————

Argued June 24, 2008

Before: SLOVITER, BARRY, and, ROTH Circuit Judges

(Filed September 9, 2008)
_____

John P. Coffey  (Argued)
Bernstein, Litowitz, Berger & Grossman
New York, NY 10019-0000

Bruce D. Bernstein
New York, NY  10022-0000

Paul B. Brickfield
Brickfield & Donahue
River Edge, NJ  07661-0000

David A.P. Brower
Brower Piven
New York, NY  10022-0000

James E. Cecchi
Lindsey H. Taylor
Carella, Byrne, Bain, Gilfillan, Cecchi,
 Stewart & Olstein
Roseland, NJ 07068-0000

Mark Levine
Stull, Stull & Brody
New York, NY 10017-0000

Michael Miarmi
New York, NY 10119-0165

Lee A. Weiss
New York, NY 10022-0000

Richard H. Weiss
New York, NY 10119-0165

Robert T. Haefele
Motley Rice
Mount Pleasant, SC 29465-0000

2

Attorneys for Appellants

Robert H. Baron
Evan R. Chesler  (Argued)
Cravath, Swaine & Moore
New York, NY 10019-0000

Roberta Koss
William R. Stein
Hughes, Hubbard & Reed
Washington, DC 20006-0000

William H. Gussman
Martin L. Perschetz
Sung-Hee Suh
Schulte, Roth & Zabel
New York, NY 10022-0000

Lawrence M. Rolnick
Sheila A. Sadighi
Lowenstein Sandler
Roseland, NJ  07068-0000

Attorneys for Appellees

_____

OPINION OF THE COURT

_____

SLOVITER, Circuit Judge.

Appellants, purchasers of Merck & Co., Inc. stock, filed the first of several class action securities fraud complaints on November 6, 2003, alleging that the company and certain of its officers and directors (collectively, "Merck") misrepresented the safety profile and commercial viability of Vioxx, a pain reliever that was withdrawn from the market in September 2004 due to safety concerns.  The District Court granted Merck's motion to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, holding that Appellants were put on inquiry notice

3

of the alleged fraud more than two years before they filed suit, and thus their claims were barred by the statute of limitations. Appellants argue that the District Court erred in finding as a matter of law that there was sufficient public information prior to November 6, 2001 to trigger Appellants' duty to investigate the alleged fraud. Because the District Court dismissed on the basis of the complaint, we must accept its allegations as true.[1]

## I.

### Factual Background

In May 1999, the Food and Drug Administration ("FDA") approved Vioxx, a new drug introduced by the pharmaceutical company Merck. Vioxx is the brand name of rofecoxib, a nonsteroidal anti-inflammatory drug ("NSAID") used in the treatment of arthritis and other acute pain. Most NSAIDs, such as aspirin, ibuprofen, and naproxen, function by inhibiting two enzymes: cyclooxygenase-1 ("COX-1"), which is associated with the maintenance of gastrointestinal ("GI") mucus and platelet aggregation, and cyclooxygenase-2 ("COX-2"), which is associated with the response to pain and inflammation. The inhibition of COX-1 leads to harmful GI side effects. Because Vioxx was designed to suppress COX-2 without affecting COX-1, Merck marketed Vioxx as possessing the beneficial effects of traditional NSAIDs but without the harmful GI side effects associated with those drugs. The market viewed Vioxx as a potential "blockbuster" drug for the company, App. at 469, and as its "savior," App. at 494.

---

[1] The District Court took judicial notice of the various public documents submitted to it in connection with the motion to dismiss. Appellants do not challenge this decision on appeal and we see no reason to disturb it. "The inquiry notice analysis is an objective one. Whether appellants read the [documents] or were aware of them is immaterial. They serve only to indicate what was in the public realm at the time, not whether the contents of those [documents] were in fact true." Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt., L.P., 435 F.3d 396, 401 n.15 (3d Cir. 2006).

Merck repeatedly touted the safety profile, sales, and commercial prospects of the drug in press releases, public statements, and Securities and Exchange Commission ("SEC") filings throughout the class period.

### A. Pre-FDA Approval and the VIGOR Study (1996 - March 2000)

Prior to the FDA's approval of Vioxx, officials at Merck were concerned that Vioxx could cause harmful cardiovascular ("CV") events, such as heart attacks. Internal emails from 1996 and 1997 demonstrate that Merck employees were aware that there was "a substantial chance" and a "possibility" of CV events that could "kill [the] drug." App. at 496. In 1998, an unpublished internal Merck clinical trial entitled Study 090 revealed that Vioxx caused a greater incidence of CV events than a placebo or a different arthritis drug.[2]

In January 1999, Merck commenced the VIOXX Gastrointestinal Outcomes Research ("VIGOR") study, which compared Vioxx to naproxen, the active ingredient in brand-name pain relievers such as Aleve and Naprosyn.[3] Although the study showed that Vioxx had a GI safety profile superior to that of naproxen, it also showed that Vioxx users had a higher incidence of CV events than naproxen users. In a March 9, 2000 email, defendant Edward Scolnick, the President of Merck Research Laboratories, acknowledged the existence of CV events,

---

[2] The sources upon which Appellants rely in making these allegations were first made public in November 2004, approximately a year after Appellants filed their initial complaint. See Anna Wilde Mathews & Barbara Martinez, Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1; 60 Minutes (CBS television broadcast Nov. 14, 2004) (transcript available on LexisNexis).

[3] See ALEVE FAQs, http://www.aleve.com/faqs.html#g21 (last visited July 25, 2008); Roche Pharmaceuticals in the U.S., Our Products, Naprosyn, http://www.rocheusa.com/products/naprosyn/ (last visited July 25, 2008).

commenting, "it is a shame but it is a low incidence and it is mechanism based as we worried it was." App. at 512.

Merck did not attempt to conceal the results of the VIGOR study. It made them public in a press release on March 27, 2000, that emphasized Vioxx's superior GI safety profile but also noted the incidence of CV events. Merck stated:

> [S]ignificantly fewer thromboembolic events were observed in patients taking naproxen in this GI outcomes study, which is consistent with naproxen's ability to block platelet aggregation. This effect on these events had not been observed previously in any clinical studies for naproxen. Vioxx, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects.

App. at 765. The press release also stated that "[a]n extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx, showed no indication of a difference in the incidence of thromboembolic events between Vioxx, placebo and comparator NSAIDs." App. at 766.

The VIGOR study results were widely reported in the press, medical journals, and securities analyst reports. Market analysts and members of the press immediately understood that CV events could be a side effect of Vioxx. Nonetheless, many observers also took notice of Merck's hypothesis that naproxen lowered CV events (the "naproxen hypothesis"). The naproxen hypothesis attributed the results of the VIGOR study to the beneficial effects of naproxen's blocking of platelet aggregation rather than to the harmful effects of Vioxx in causing thromboembolic events. The issue whether naproxen lowered the heart attack risk or Vioxx caused it was thus presented. While many analysts noted that the naproxen hypothesis was unproven, some also concluded that it was the most likely explanation for the increased CV events observed in the VIGOR study.

One representative article distributed by Reuters on April

6

27, 2000, quoted a Merck spokesman who acknowledged the "statistically significant" finding that patients of Vioxx had a higher rate of CV events, but suggested that this might be explained by a beneficial effect of naproxen. App. at 2287. In that same article, however, a spokesperson for the manufacturer of Naprosyn explained that the company had no knowledge that naproxen prevented heart attacks or strokes; similarly, an analyst for ABN Amro suggested that he was skeptical of Merck's explanation.

## B. FDA AAC Hearing (February 8, 2001)

On February 8, 2001, the FDA's Arthritis Advisory Committee ("AAC") held a public hearing to consider Merck's request to include the positive GI results from the VIGOR study in its Vioxx labeling. Six days before that hearing, J.P. Morgan issued a research report summing up the state of knowledge about Vioxx after the VIGOR study. The report stated that the basic idea behind the naproxen hypothesis was "poorly proven," and that there was "no way to retrospectively slice the data to prove the NSAID benefit vs. Vioxx risk argument," although one existing theory "might support a 'Vioxx risk' hypothesis." App. at 2547. J.P. Morgan warned, "[t]his is the type of clinical 'signal' that was ignored, and later haunted the FDA in recent drug recalls like Warner Lambert's Rezulin and Glaxo's Lotronex." App. at 2547.

During the AAC hearing, defendant Alise Reicin, Executive Director of Clinical Research at Merck Research Laboratories, explained to the panel, "when you review the results of VIGOR in isolation you don't know whether the imbalance of cardiovascular events was caused by a decrease in events on a platelet-inhibiting NSAID, naproxen, or an increase in events on a COX-2 selective inhibitor," i.e., Vioxx. App. at 995. She then suggested that naproxen was likely responsible for the difference in CV events observed in users of the two drugs. At the public portion of the hearing, the panel subsequently discussed whether to call for the inclusion of a warning in the Vioxx labeling stating that it was "uncertain" whether the CV events noticed in VIGOR were "due to beneficial cardioprotective effects of naproxen or prothrombotic effects of [Vioxx], and leave it at that, that basically we don't know

7

the reason." App. at 1143.

Nonetheless, some press accounts reported that certain AAC panel members asserted that "[d]ifferences in cardiac risk between Vioxx and naproxen appeared to result from a beneficial effect of naproxen, not a danger from Vioxx," App. at 2311, and that there was "some reassurance that what we see, in effect, is a protective effect of naproxen," App. at 2306. In subsequent coverage, many securities analysts reported that the hearing had benefited Merck and they continued to project substantial future revenues for Vioxx. However, at least one investment firm issued a report stating, "our skepticism relating to naproxen having a cardioprotective effect is reinforced" by the AAC hearing. App. at 2703.

## C. First Vioxx Product Liability Lawsuit (May 2001)

In May 2001, a product liability lawsuit was filed jointly against Merck and the makers of Celebrex, a rival COX-2 selective inhibitor. The complaint alleged that the pharmaceutical companies "have consistently marketed Vioxx and Celebrex as highly effective pain relief drugs for patients suffering from osteoarthritis," despite the fact that "Merck's own research" demonstrated that "users of Vioxx were four times as likely to suffer heart attacks as compared to other less expensive medications, or combinations thereof." App. at 1748. The plaintiffs sought "emergency notice to class members and revised patient warnings, in the form of additional medical labeling which is presently being considered by the FDA . . . ." App. at 1748.

## D. JAMA Article (August 22, 2001)

On August 22, 2001, the Journal of the American Medical Association ("JAMA") reported the results of a study of Vioxx and Celebrex clinical trials. The JAMA article asserted that available data raised a "cautionary flag" about the risk of CV events associated with COX-2 inhibitors. App. at 748. It also stated that "[c]urrent data would suggest that use of selective COX-2 inhibitors might lead to increased cardiovascular events." App. at 752. The day before that article was published, Bloomberg News reported the statement of a Merck scientist that "[w]e already have

8

additional data beyond what they cite, and the findings are very, very reassuring. VIOXX does not result in any increase in cardiovascular events compared to placebo." App. at 539. The JAMA article garnered extensive coverage. Some securities analysts responding to the article on the date of its publication referred to the basic content of the article as "not new news," App. at 2749, and noted that the FDA "debated many of the same issues in February of this year," at the AAC panel hearing. App. at 2751.

The day after the JAMA article's publication, Merck issued a press release stating that it "stands behind the overall and cardiovascular safety profile . . . of VIOXX." App. at 540. Merck also sent "'Dear Doctor' letters to physicians throughout the country disparaging the article as 'not based on any new clinical study' and assuring the physicians that Merck 'stands behind the overall and cardiovascular safety profile' of VIOXX.'" App. at 540.

### E. FDA Warning Letter (September 21, 2001)

On September 21, 2001, the FDA posted on its website a warning letter that its Division of Drug Marketing, Advertising, and Communications ("DDMAC") had sent to Merck four days earlier regarding its marketing and promotion of Vioxx. In the letter, the DDMAC stated that Merck's "promotional activities and materials" for the marketing of Vioxx were "false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations." App. at 713. The letter explained:

> You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the [VIGOR] study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

9

Although the exact reason for the increased rate of MIs observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.

App. at 713. The letter also directed Merck to issue "Dear Healthcare provider" letters "to correct false or misleading impressions and information." App. at 719.

The FDA warning letter received widespread coverage by the media and securities analysts. Although many media reports focused on the mere fact of the warning letter,[4] securities analysts

_____

[4] A few representative examples follow: Reuters -- "U.S. regulators have charged . . . Merck . . . with misleading doctors about its blockbuster painkiller Vioxx with promotions that downplayed a possible risk of heart attacks." App. at 2353. Associated Press -- "Merck has argued that [the VIGOR study results make] Vioxx falsely look[] risky because naproxen thins the blood . . . and thus protect[s] against heart attacks. . . . 'In fact, the situation is not at all clear,' [according to] the FDA . . . ." App. at 2360. USA Today -- "Merck's marketing efforts, aimed mainly at doctors, have minimized Vioxx's known and potential cardiovascular risks, the FDA wrote in an eight-page 'warning letter' . . . . So far this year, the FDA has sent drug companies fewer than a dozen warning letters, which the agency reserves for activities that raise significant public health concerns." App. at 2355. Wall Street Journal -- "Federal regulators warned Merck & Co. for improper marketing of its blockbuster arthritis drug Vioxx, saying the company had misrepresented the drug's safety profile and minimized its potential risks. . . . While the FDA sends out dozens of routine citations annually, it issues only a handful of

tended to emphasize the impact the warning letter would likely have on the prospective Vioxx labeling changes (which were not forthcoming until April 2002),[5] Merck's ongoing promotional efforts,[6] and Merck's position in the market.[7] A report issued by UBS Warburg explained, "[t]he FDA pointed out that there is no definitive study proving or disproving either conclusion [regarding the higher incidence of CV events associated with Vioxx in the VIGOR study]. . . . The FDA's position appears similar to our own, which is that the data available to date are simply not definitive." App. at 2768. Nonetheless, securities analysts were of one voice in their projections for Merck and Vioxx; analysts from CIBC World Markets, Credit Suisse First Boston ("CSFB"), Dain Rauscher, Lehman Brothers, UBS Warburg, SG Cowen, and

---

these more-serious warning letters each year." App. at 2361.

[5] For example, a report issued by Lehman Brothers stated: "We do not believe this letter will be predictive of the FDA's actions on the pending Vioxx label change. . . . Warning letters of this nature are certainly not unusual and in fact almost a staple of the pharmaceutical industry today. . . . As pointed out in the FDA warning letter, DDMAC does not dispute Merck's claims." App. at 2765-66.

[6] One report issued by Merrill Lynch stated: "The FDA issued a warning letter to Merck . . . [and] is looking for Merck to cease all violative promotional activities . . . . We do not see how this issue can be helpful to Merck in promoting Vioxx." App. at 2752.

[7] A Dain Rauscher report focused on Vioxx's position in the actual marketplace, i.e., the doctor's office: "We believe th[e FDA warning letter] is unlikely to significantly alter physicians' prescribing practices [because it] is likely that these issues are already common knowledge in the medical community . . . ." App. at 2762. Meanwhile, a CIBC World Markets report considered how the warning letter might impact Merck's stock price: "The FDA warning letter as well as a recent JAMA article raising concerns of cardiovascular risk will continue to pressure the stock, now trading close to its 52-week low." App. at 2755.

11

Morgan Stanley all maintained their ratings for Merck stock at "buy" or "hold" and/or continued to project increased future revenues for Vioxx.

In the five days between September 20, 2001 and September 25, 2001, Merck's stock price declined by $4.16, or 6.6%, closing at $59.11 on September 25. Reuters reported this drop on September 25, explaining that "[s]hares of Merck & Co. fell . . . after U.S. regulators accused the firm of making unsubstantiated claims about its hot-selling arthritis drug Vioxx and downplaying a possible risk of heart attack from taking the medicine." App. at 2357. By October 1, 2001, however, Merck's stock price had rebounded to $64.66, $1.39 higher than its closing price before the warning letter was made public just over a week earlier.

**F. Additional Vioxx Lawsuits (September 27, 2001)**

A consumer fraud lawsuit was filed against Merck on behalf of Vioxx users on September 27, 2001. A second product liability lawsuit and a personal injury lawsuit followed shortly thereafter. In articulating their allegations of fraud and misrepresentations by Merck to consumers and Vioxx users, the consumer fraud and product liability suits relied in large part on the JAMA article, the FDA warning letter, and various media reports concerning Vioxx.

**G. New York Times Article (October 9, 2001)**

On October 9, 2001, the New York Times published an article about COX-2 inhibitors entitled "The Doctor's World; For Pain Reliever, Questions of Risk Remain Unresolved." App. at 653. The article reported on "troubling questions about whether Vioxx may have an unexpected side effect -- a very slight increase in the risk of heart attack." App. at 653. However, the article explained that "[t]he risk is hypothesized, not proved," and that "leading arthritis specialists . . . say that they are not concerned and that they prescribe the drugs for patients who may have heart disease." App. at 653. The article noted that "[a]t issue is the subtle question of what counts as evidence," App. at 653, explaining that the risk that COX-2 inhibitors cause blood-clotting was originally posed as a theory a few years earlier by a scientist

12

from the University of Pennsylvania.

The article addressed defendant Scolnick's statements at length. According to the article, Scolnick said that Merck "look[ed] specifically for excess heart attacks and strokes in" the VIGOR study and found a higher incidence in the patients taking Vioxx. App. at 654. "'There are two possible interpretations,' Dr. Scolnick said. 'Naproxen lowers the heart attack rate, or Vioxx raises it.'" App. at 654. The article went on, "while [Merck] announced the heart attack findings to doctors and the public, it looked back at its data from studies using different drugs or dummy pills in comparison to Vioxx. It found no evidence that Vioxx increased the risk of heart attacks, Dr. Scolnick said." App. at 654. "He said that the company decided that 'the likeliest interpretation of the data is that naproxen lowered . . . the thrombotic event rate' . . . . He added that without the theoretical question raised by [the University of Pennsylvania scientist], 'no one would have a question remaining in their mind that their [sic] might be an additional interpretation.'" App. at 654. The article reported Scolnick as conceding that "none of the findings to date are enough to prove that the issue is fully resolved. That lack of proof is why the F.D.A. demanded that Merck explain both sides of the hypothesis, telling doctors and patients that it is not known whether naproxen protects against heart attacks or Vioxx makes them more likely." App. at 654.

There was no significant movement in Merck's stock price following the publication of the New York Times article.

### H. Vioxx's Labeling Modified to Include CV Risks (April 2002)

Merck was not required to include the risk of CV events in its labeling until April 2002. The labeling ultimately incorporating that information explained the VIGOR study results and stated, "the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX . . . as compared to patients treated with naproxen . . . . The significance of the cardiovascular findings . . . is unknown." App. at 553. This language was incorporated into the "precautions" section of the

13

Vioxx labeling, rather than the "warnings" section. In a conference call discussing the labeling changes, a Merck spokesperson reiterated the company's "belief that the effect seen in VIGOR were [sic] the results of the anti-platelet effect of naproxen. . . . So, I think that's a position Merck has always had and now its [sic] quite clearly laid out in the labeling." App. at 559.

### I. Falling Vioxx Sales and the Harvard Study (October 2003)

On October 22, 2003, Reuters published an article entitled "Merck to Cut 4,400 Jobs, posts Flat Earnings," in which it reported that Merck was "hurt by falling sales of arthritis medicine VIOXX and a paucity of profitable new drugs. . . . The arthritis drug is suffering from clinical trial data suggesting it might slightly raise the risk of heart attacks . . . ." App. at 570. That day, Merck's stock price dropped from $48.91 to $45.72, down 6.5%.

On October 30, 2003, the Wall Street Journal published an article entitled "VIOXX Study Sees Heart-Attack Risk," which addressed a recent study by the Harvard-affiliated Brigham and Women's Hospital in Boston that found an increased risk of heart attack in patients taking Vioxx compared with patients taking Celebrex and placebo (the "Harvard study"). App. at 571. According to the article, "[i]n the first 30 days, the researchers found, VIOXX was linked to a 39% increased heart-attack risk compared with Celebrex. Between 30 and 90 days, that increased relative risk was 37%." App. at 571. A researcher stated that this was "the best study to date" and that it "greatly substantiates our concerns about the cardiac side effects" of Vioxx. App. at 571.

Merck's stock price dropped below the S&P 500 Index during this time, and did not rise above that index during the remainder of the class period.

### J. Merck Withdraws Vioxx From the Market (September 2004)

On September 30, 2004, Merck announced that it was withdrawing Vioxx from the market based on a new study showing

an "increased risk of confirmed cardiovascular events beginning after 18 months of continuous therapy." App. at 584. Merck's stock price dropped more than $12 per share that day, to close at $33.00, down 27% from the previous day's close. Securities analysts expressed their surprise at the suddenness of Merck's action.

On November 1, 2004, the Wall Street Journal reported, "internal Merck e-mails and marketing materials as well as interviews with outside scientists show that the company fought forcefully for years to keep safety concerns from destroying the drug's commercial prospects." App. at 589. Merck's stock price dropped another 9.7% based on this news. The news, which was first published nearly a year after Appellants filed their complaint, prompted one securities analyst to remark, "new information indicates to us that the situation might not be as innocent as we thought. . . . We recommend that investors sell Merck shares." App. at 594.

## II.

### Procedural History

The first class action securities complaint initiating this lawsuit was filed on November 6, 2003, just weeks after the media reported the results of the Harvard study and declining Vioxx sales. After numerous nationwide class actions were consolidated, Appellants filed a fourth amended consolidated class action complaint. The complaint alleged that "Defendants' statements and omissions during the Class Period materially misrepresented the safety and commercial viability of VIOXX," App. at 489, in violation of sections 11, 12(a)(2), and 15 of the Securities Act of 1933, sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.

Merck moved to dismiss Appellants' claims on the grounds that they were time-barred and that Appellants had failed to state a claim. The District Court granted that motion on the basis that the claims were time-barred. In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig., 483 F. Supp. 2d 407, 425 (D.N.J.

2007).[8]  Appellants timely filed a notice of appeal.

## III.

### Jurisdiction and Standard of Review

The District Court had jurisdiction over this action pursuant to section 22 of the Securities Act, 15 U.S.C. § 77v; section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1331.  We have jurisdiction pursuant to 28 U.S.C. § 1291.  We exercise plenary review over the District Court's dismissal of Appellants' claims for failure to comply with the statute of limitations.  DeBenedictis v. Merrill Lynch & Co., Inc., 492 F.3d 209, 215 (3d Cir. 2007).  Because the District Court granted Merck's motion to dismiss, "[w]e must 'accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party.'"  Id. (quoting Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989)).  The dismissal must be upheld only "'if it appears to a certainty that no relief could be granted under any set of facts which could be proved.'"  Id. (quoting D.P. Enters., Inc. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984)).

## IV.

### Discussion

The relevant statutes each contain their own statute of limitations.  A complaint alleging "fraud, deceit, manipulation, or contrivance" under the Securities Exchange Act "may be brought not later than the earlier of . . . 2 years after the discovery of the facts constituting the violation; or . . . 5 years after such violation."

---

[8] The District Court did not address Merck's argument that the allegations contained in the fourth amended consolidated class action complaint failed to satisfy the heightened standards of the Private Securities Litigation Reform Act of 1995 for pleading scienter, and we do not express any opinion on this issue.

28 U.S.C. § 1658(b). Claims under the Securities Act are subject to a shorter, one-year limitation period from the time of discovery, but in no event may be filed later than three years after the public offering or sale of the security. 15 U.S.C. § 77m. Thus, if Appellants knew of the basis for their claims prior to November 6, 2001, two years before the first securities complaint was filed, all of their claims are barred by the statute of limitations. See DeBenedictis, 492 F.3d at 216.

"Whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had 'sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity.'" Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt., L.P., 435 F.3d 396, 400 (3d Cir. 2006) (quoting In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1325 (3d Cir. 2002)). This is an objective question; thus, an investor is not on inquiry notice until a "'reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.'" In re NAHC, 306 F.3d at 1325 (quoting Mathews v. Kidder, Peabody & Co., 260 F.3d 239, 252 (3d Cir. 2001)).

"If the existence of storm warnings is adequately established the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries." DeBenedictis, 492 F.3d at 216 (citations, alterations, and internal quotation marks omitted). Here, the District Court held that Appellants were on inquiry notice of their claims no later than October 9, 2001, the date the New York Times published the article reporting that defendant Scolnick "acknowledged that Merck knew that the cardioprotective effect of naproxen was not proven and, further, that Merck admitted that VIOXX may raise the risk of heart attack or other thrombotic event." In re Merck, 483 F. Supp. 2d at 419. The Court also noted what it characterized as the "overwhelming collection of information signaling deceit by Merck with respect to the safety of VIOXX [that] had accumulated in the public realm" by that date, in particular, the FDA warning letter. Id. In concluding that sufficient storm warnings of fraud existed more than two years prior to the filing of Appellants' complaint,

17

the District Court observed that Appellants' "position that their claims did not accrue until the existence of fraud was a probability, as opposed to a possibility . . . is simply not supported by Third Circuit law." Id. at 422. Finally, noting that Appellants had "not argued that they conducted a diligent investigation, and nothing in the Complaint demonstrates that they were unable to uncover pertinent information during the limitations period," the Court concluded that Appellants' claims were time-barred and granted Merck's motion to dismiss. Id. at 424.

## A. Principles of Inquiry Notice

Before reviewing the District Court's decision, we must address an ambiguity in our inquiry notice jurisprudence. Appellants contend that the statute of limitations does not begin to run until there is sufficient evidence of probable, rather than possible, wrongdoing by the defendants. Predictably, Merck supports the latter standard, arguing that inquiry notice may be triggered by evidence of possible wrongdoing. Both formulations find support in this court's precedents. Compare DeBenedictis, 492 F.3d at 216 (Inquiry notice may be established by proof of "'financial, legal, or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made.'") (quoting In re NAHC, 306 F.3d at 1326-27 n.5) (emphasis added), with Benak, 435 F.3d at 400 ("'Whether the plaintiffs . . . should have known of the basis for their claims depends on whether they had "sufficient information of possible wrongdoing to place them on 'inquiry notice' . . . ."'") (quoting In re NAHC, 306 F.3d at 1325) (emphasis added). We therefore take this opportunity to clarify the standard for inquiry notice in this circuit.

Our first comprehensive discussion of the appropriate standard for inquiry notice took place in the context of a claim filed pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO").[9] See Mathews, 260 F.3d at 241. In Mathews,

---

[9] Quoting extensively from Mathews, we recently reiterated the inquiry notice standard for RICO claims in Cetel v. Kirwan

investors in low-risk securities sued their broker after the securities had lost more than half their value, alleging that the broker misled them about the nature of the funds and charged excessive fees and commissions. We affirmed the district court's grant of summary judgment for the broker because the complaint was time-barred. Id. at 244. In analyzing whether plaintiffs' suit was filed before RICO's statute of limitations had run, we applied a two-pronged test derived from the inquiry notice standard other courts had applied in the context of securities fraud claims. Id. at 251-52.

First, we noted the requirement to make an objective inquiry into whether the defendant had met its burden "to show the existence of 'storm warnings.'" Id. at 252. We explained that storm warnings "may take numerous forms," such as "'any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made.'" Id. (quoting unpublished district court opinion).[10] Second, we described an inquiry, "both subjective and objective," into whether the plaintiffs had met their burden "to show that they exercised reasonable due diligence and yet were unable to discover their injuries." Id. We then noted our agreement with the Court of Appeals for the Seventh Circuit that courts should be "mindful of the dangers in adopting too broad an interpretation of inquiry notice." Id. at 253 (citing Law v. Medco Research, Inc. ("Medco II"), 113 F.3d 781, 786 (7th Cir. 1997); Fujisawa Pharm. Co. v. Kapoor, 115 F.3d 1332, 1335 (7th Cir. 1997)).

A year later, we applied this standard to claims pleaded

_____

Financial Group, Inc., 460 F.3d 494, 506-07 (3d Cir. 2006).

[10] Immediately before using this language regarding a "probability" of fraud, we noted without criticism that the district court had also framed the first prong of the inquiry notice standard as "'whether the plaintiffs knew or should have known of the possibility of fraud ("storm warnings") . . . .'" Mathews, 260 F.3d at 251-52 (quoting unpublished district court opinion). Thus, there is no basis to conclude that we rejected the notion of a possibility standard at that time.

19

under the federal securities laws. See In re NAHC, 306 F.3d at 1318. The shareholders' claims in that case arose from a health care provider's collapse after the federal government enacted regulations that negatively impacted the provider's long-term care services business. Id. at 1318-21. In formally adopting the inquiry notice standard for securities claims, we stated that "[w]hether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had 'sufficient information of possible wrongdoing to place them on "inquiry notice" or to excite "storm warnings" of culpable activity.'"[11] Id. at 1325 (quoting Gruber v. Price Waterhouse, 697 F. Supp. 859, 864 (E.D. Pa. 1988)). We explained that "[p]laintiffs need not know all of the details or 'narrow aspects' of the alleged fraud to trigger the limitations period; instead, the period begins to run from 'the time at which plaintiff should have discovered the general fraudulent scheme.'" Id. at 1326 (quoting In re Prudential Ins. Co. Sales Practices Litig., 975 F. Supp. 584, 599 (D.N.J. 1997)).

In affirming the district court's dismissal of the plaintiffs' claim arising from the impact of the federal regulations on the defendants' long-term care services business, we held that a series of disclosures, which accompanied a drastic decline in the company's stock price, id. at 1319, and culminated with the defendants' announcement that they were writing off goodwill and selling their business for nominal consideration, put the plaintiffs on inquiry notice that previous valuations of goodwill had been inflated, id. at 1326-27. This holding was bolstered by the plaintiffs' admission that the market had written off that business even before the defendants' announcement. Id. at 1327.

More recently, in 2006, we considered whether a suit filed

---

[11] In a footnote of the same opinion, however, we stated that inquiry notice could be established on the basis of "'data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made.'" See In re NAHC, 306 F.3d at 1325-26 n.5 (quoting Mathews, 260 F.3d at 252).

by mutual fund investors against fund advisors who had invested heavily in Enron was barred by the statute of limitations. Benak, 435 F.3d at 397. In our decision, we dispensed with the probability language altogether, instead holding that storm warnings could be triggered by "'sufficient information of possible wrongdoing . . . .'" Id. at 400 (quoting In re NAHC, 306 F.3d at 1325). Applying our inquiry notice standard to the facts of that case, we distinguished mutual fund investors from direct investors on the ground that mutual fund investors rely on an intermediary to learn about the companies in which they have invested. Id. at 401-02. Nonetheless, because the investors in Benak had access to media reports about their fund's large holdings in Enron after that company went bankrupt, we concluded that the plaintiffs were on inquiry notice of the fraud by the time the media reported the bankruptcy. Id. at 402-03.

Finally, in a case decided just last year, we considered investors' claims that Merrill Lynch misled them by failing to disclose that a certain class of mutual fund shares was "never a rational choice of investment for them and that Merrill brokers received larger commissions on sales of such shares." DeBenedictis, 492 F.3d at 210. Merrill argued that news articles, National Association of Securities Dealers ("NASD") press releases, and the mutual funds' registration statements put the class on inquiry notice more than two years before the complaint was filed and that it should therefore be dismissed as time-barred. Id. at 214. After quoting the "probability" language first used by the district court in Mathews, we addressed each category of storm warnings alleged. We noted that Merrill's registration statements disclosed the fee structure for the different classes of shares, which allowed investors to determine the relative costs and benefits of the different shares, and the different commissions applying to those shares. Id. at 216-17. We further concluded that storm warnings existed because the news reports and press releases identified by the defendants revealed that many brokers had been disciplined by the NASD for recommending the very class of shares that undergirded the plaintiffs' claims. Id. at 217. Accordingly, we concluded that the plaintiffs' claims were time-barred.

As this review of our precedent makes clear, although we

21

have occasionally stated that inquiry notice may be triggered by evidence alerting an investor to the probability of wrongdoing, we have just as often emphasized that inquiry notice may be triggered by sufficient information of possible wrongdoing. This implies that a probability, in the sense of a nearly certain likelihood, of wrongdoing is not necessary to trigger storm warnings in this circuit. Therefore, we reaffirm that "whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had sufficient information of possible wrongdoing to place them on inquiry notice or to excite storm warnings of culpable activity." Benak, 435 F.3d at 400 (citations, alteration, and internal quotation marks omitted). In so holding, we note that the majority of courts of appeals to have addressed the question employ a possibility standard when evaluating the likelihood of wrongdoing sufficient to constitute storm warnings. See, e.g., GO Computer, Inc. v. Microsoft Corp., 508 F.3d 170, 179 (4th Cir. 2007); Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 970 (11th Cir. 2007); Wolinetz v. Berkshire Life Ins. Co., 361 F.3d 44, 48 (1st Cir. 2004); Ritchey v. Horner, 244 F.3d 635, 639 (8th Cir. 2001); Berry v. Valence Tech., Inc., 175 F.3d 699, 705 (9th Cir. 1999); Sterlin v. Biomune Sys., 154 F.3d 1191, 1196 (10th Cir. 1998); LaSalle v. Medco Research, Inc. ("Medco I"), 54 F.3d 443, 444 (7th Cir. 1995); Jensen v. Snellings, 841 F.2d 600, 607 (5th Cir. 1988). But see Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003) ("The [existence of] fraud must be probable, not merely possible.").

Nonetheless, simply repeating the word "possibility" or "probability" with ever-increasing frequency and intensity (as both parties did in their briefs and at oral argument) is hardly useful. Rather, we review the information set forth by the parties with an eye toward the practical effect of drawing the inquiry notice line at a particular date. In this vein, we have emphasized that "[u]ndergirding the inquiry notice analysis is the assumption that a plaintiff either was or should have been able, in the exercise of reasonable diligence, to file an adequately pled securities fraud complaint as of an earlier date." Benak, 435 F.3d at 401. Similarly, the Court of Appeals for the Seventh Circuit, which has also applied a possibility standard, see Medco I, 54 F.3d at 444, has reasoned that "[t]he facts constituting [inquiry] notice must be

22

sufficiently probative of fraud–sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or substantiated–not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit," Fujisawa, 115 F.3d at 1335. In other words, simply stating that a smattering of evidence hinted at the possibility of some type of fraud does not answer the question whether there was "sufficient information of possible wrongdoing . . . to excite storm warnings of culpable activity" under the securities laws. Benak, 435 F.3d at 400 (citations and internal quotation marks omitted) (emphasis added).

This concern is reenforced by the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).[12] Surely, Congress did not envision a statute of limitations that would open the floodgates to a rush of premature securities litigation when its primary foray into this field in recent decades has been to deter poorly pleaded allegations of securities fraud. See DeBenedictis, 492 F.3d at 217-18 (noting that "'the level of particularity in pleading required by the PSLRA is such that inquiry notice can be established only where the triggering data "relates directly to the misrepresentations and omissions" alleged.'") (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 171 (2d Cir. 2005)); cf. Mathews, 260 F.3d at 253 (expressing concern about "a flood of untimely litigation" were we to "adopt[] too broad an interpretation of inquiry notice").

**B. Basis of Appellants' Claims**

Appellants argue that the District Court mischaracterized the gravamen of their fraud allegations, thereby undermining the Court's conclusion that Appellants were on inquiry notice of the

---

[12] The PSLRA requires plaintiffs pleading securities fraud to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), and to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," i.e., scienter, id. § 78u-4(b)(2).

alleged wrongdoing. We have repeatedly stated that the fundamental concern of our analysis is whether plaintiffs were "'on inquiry notice of the basis for [their] claims'" prior to the relevant date triggering the statute of limitations. Benak, 435 F.3d at 400 (quoting In re NAHC, 306 F.3d at 1325). Therefore, we must carefully scrutinize the District Court's characterization of the basis for Appellants' claims and consider how this characterization affected the Court's inquiry notice analysis.

First, Appellants contend that the Court mischaracterized the basis for their claims by focusing on alleged misrepresentations about Vioxx's safety profile. In concluding that sufficient storm warnings existed to put Appellants on inquiry notice, the District Court considered the "overwhelming collection of information signaling deceit by Merck with respect to the safety of VIOXX [that] had accumulated in the public realm" by October 9, 2001. In re Merck, 483 F. Supp. 2d at 419. Appellants argue that the true nature of their claims is that Vioxx "was so dangerous that it lacked any meaningful commercial prospects, or that [Merck's] representations in this regard were materially false and misleading when made . . . ." Appellant's Br. at 35. The difficulty with this contention is that Merck's representations about Vioxx's commercial viability are not unrelated to the company's representations about the drug's safety profile. If public information undermined Merck's representations about Vioxx's safety, a reasonable investor would also likely see such information as undermining Merck's representations about Vioxx's commercial viability. Indeed, some professional investors connected concerns about the safety of COX-2 inhibitors to their commercial viability.

Nonetheless, the fact that many securities analysts continued to maintain strong growth ratings for Vioxx at the same time that its safety was being questioned is certainly relevant to whether such questions constituted sufficient information of possible wrongdoing to trigger storm warnings. Even though there were analysts who connected Vioxx's safety to its commercial viability, it appears that they were not so worried about Vioxx's safety after the FDA warning letter was made public that they felt it necessary to retract their opinions about Vioxx's future profitability or

Merck's market position.[13]   In any event, Appellants argue that even if their claims are properly characterized as alleging misrepresentations about Vioxx's safety, the District Court misinterpreted their claims in another respect.

Appellants contend that their complaint challenges the veracity of Merck's statements of opinion and belief regarding the naproxen hypothesis whereas the District Court analyzed whether Merck misrepresented the fact that the results of the VIGOR study could support multiple hypotheses (i.e., that naproxen lowers the risk of CV events or that Vioxx raises that risk).  Thus, they argue that the District Court mischaracterized their claims by considering whether there were storm warnings that put them on notice of a fraud different from that which they have asserted in their complaint.

We have explained that for "misrepresentations in an opinion" or belief to be actionable, plaintiffs must show that the statement was "'issued without a genuine belief or reasonable basis' . . . ."  Herskowitz v. Nutri/System, Inc., 857 F.2d 179, 185 (3d Cir. 1988) (quoting Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir. 1985)); accord Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1095 (1991) ("A statement of belief may be open to objection . . . as a misstatement of the psychological fact of the speaker's belief in what he says.").  Thus, to trigger "storm warnings of culpable activity," Benak, 435 F.3d at 400 (citations and internal quotation marks omitted), in the context of a claim alleging falsely-held opinions or beliefs, investors must have

---

[13]A September 25, 2001 report by a CSFB analyst illustrates the interrelatedness of the two propositions: "Recent prescription trends have indicated that adverse publicity and cardiovascular concerns have contributed to erosion in Vioxx (as well as Celebrex) market share within the collective COX-2/NSAID market."  App. at 2757.  On the other hand, the same CSFB report also "project[ed] Vioxx revenues will increase 42% year over year to $3.06 billion for 2001, with growth moderating to the +14% level in 2002 to $3.49 billion.  We maintain our Buy rating."  App. at 2757.

sufficient information to suspect that the defendants engaged in culpable activity, i.e., that they did not hold those opinions or beliefs in earnest. Appellants' theory in the complaint is that Merck's statements about the validity of the naproxen hypothesis were falsely-held statements of opinion or belief and that there was no information available to investors prior to November 6, 2001 that would have led them to suspect that such statements were not held in earnest. The District Court rejected this argument, concluding that "[i]t is prepost[e]rous for Plaintiffs to argue that because they did not have a 'smoking gun' that demonstrated that Defendants' misrepresentation was even more egregious than the [FDA] Warning Letter charged, they were not on inquiry notice of a general fraudulent scheme regarding the safety of VIOXX." In re Merck, 483 F. Supp. 2d at 422-23. We disagree.

It is true that "[p]laintiffs cannot avoid the time bar simply by claiming they lacked knowledge of the details or narrow aspects of the alleged fraud. Rather, the clock starts when they should have discovered the general fraudulent scheme." Benak, 435 F.3d at 400 (citations and internal quotation marks omitted). The "fraudulent scheme" referred to must be one "in connection with the purchase or sale of any security . . . ." 15 U.S.C. § 78j(b). Appellants have brought a securities fraud action, not a consumer fraud action, against Merck. See Gavin v. AT & T Corp., 464 F.3d 634, 640 (7th Cir. 2006) (recognizing that securities fraud suits and consumer fraud suits are not interchangeable); cf. Marine Bank v. Weaver, 455 U.S. 551, 556 (1982) ("Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud."). Thus, the fact that the FDA sent a letter to Merck about its possible misrepresentations in connection with its promotion of Vioxx to health care professionals would not have provided a storm warning unless it put Appellants on inquiry notice of actionable misrepresentations under the securities laws. See DeBenedictis, 492 F.3d at 218 (finding storm warning where disclosure was "directly applicable to the representations or omissions" challenged by plaintiffs). The asserted basis of Appellants' claims is that Merck defrauded investors by proposing and reasserting the naproxen hypothesis at the same time that it knew the hypothesis was false. We must analyze the existence of storm warnings relative to that allegation in order to determine

whether Appellants were on inquiry notice of the alleged fraud.

### C. Existence of Storm Warnings

Because the District Court believed that "[t]he wrongdoing charged in the [FDA] Warning Letter is . . . the same alleged misconduct on which the securities fraud claims in this case are predicated," the Court asserted that it "might arguably conclude that the FDA Warning Letter alone excited storm warnings sufficient to put Plaintiffs on inquiry notice of their claims against Merck," but it decided that it "need not make that conclusion, because the FDA Warning Letter was not issued in a vacuum of information." In re Merck, 483 F. Supp. 2d at 419. The Court then took notice of the JAMA article, the lawsuits filed against Merck in 2001, and various articles discussing competing explanations for the results of the VIGOR study. Id. at 419-21. The Court reasoned that the New York Times article following the FDA warning letter was especially probative because Scolnick "admitted that Merck recognized the possibility that VIOXX may increase a user's risk of heart attack. It therefore represents a significant departure from Merck's company line as to the explanation for the VIGOR study results." Id. at 420. The Court then rejected Appellants' argument that positive information issued by Merck during this period dissipated any storm warnings. Id. at 421.

Appellants argue that to the extent the disclosures identified by Merck might be seen as triggering storm warnings, such storm warnings were dissipated by Merck's reassuring statements,[14] and

---

[14] We have recognized that "reassurances can dissipate apparent storm warnings if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns." Benak, 435 F.3d at 402 n.16 (citation, alteration, and internal quotation marks omitted). "'Whether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend in large part on how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the "reassuring" steps announced to avoid their recurrence.'" DeBenedictis, 492 F.3d at 218 (quoting LC

27

are undermined by the failure of the identified disclosures to have any significant impact on Merck's stock price or the projections of securities analysts covering Merck. Merck argues that stock price movement is irrelevant to the inquiry notice analysis. We cannot agree. Our past inquiry notice decisions have taken into account the market reaction to disclosures that purportedly constitute storm warnings. See, e.g., In re NAHC, 306 F.3d at 1319 (discussing drastic decline in stock price accompanying disclosures in period leading up to date of inquiry notice); cf. Benak, 435 F.3d at 403 (noting that Enron's collapse and subsequent bankruptcy triggered inquiry notice); Mathews, 260 F.3d at 254 (explaining that 30% drop in funds' net asset values and 60% decline in distributions triggered inquiry notice). In Mathews, we explained that "in most securities fraud actions, the plaintiffs' [losses] are inextricably intertwined with the defendant's misrepresentations. Discovery of one leads almost immediately to discovery of the other." Mathews, 260 F.3d at 251. Similarly, in the context of materiality, we have stated that in "an efficient market, 'information important to reasonable investors . . . is immediately incorporated into the stock price.'" Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997)). "If the disclosure of certain information has no effect on stock prices, it follows that the information disclosed was immaterial as a matter of law." In re NAHC, 306 F.3d at 1330 (citing In re Burlington Coat Factory, 114 F.3d at 1425).

Because information that is material to reasonable investors is immediately incorporated into the stock price, the effect of a purported storm warning on the market, while insufficient on its own to compel the conclusion that inquiry notice has not been triggered, is, contrary to Merck's position, relevant to our inquiry. See Newman, 335 F.3d at 195 (asserting that the court's "holding is further supported by the fact that [defendant]'s stock price did not have any significant movement following" the identified disclosure); Berry, 175 F.3d at 705 (concluding that the lack of significant stock movement "bolster[ed]" the conclusion that

Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 155 (2d Cir. 2003)).

28

inquiry notice had not been triggered).

The District Court (and Merck on this appeal) emphasized five classes of information, each of which was disclosed on or before October 9, 2001, which purportedly triggered storm warnings: (1) articles and reports commenting on the hypothetical explanations for the results of the VIGOR study; (2) the JAMA article, which asserted that available data (i.e., VIGOR and a Celebrex study) raised a "cautionary flag" about the risk of CV events in COX-2 inhibitors, App. at 748; (3) the FDA warning letter, which charged Merck with "engag[ing] in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the [VIGOR] study, and thus, misrepresents the safety profile for Vioxx," App. at 713; (4) the consumer fraud, product liability, and personal injury lawsuits filed against Merck throughout 2001; and (5) the New York Times article, in which Scolnick stated there were "two possible interpretations" for the VIGOR results, App. at 654. Because the disclosures in each of these categories ultimately arise from the results of the VIGOR study, we briefly recap the details of the study.

VIGOR compared Vioxx to naproxen in the hopes of establishing that Vioxx had a better GI profile than traditional NSAIDs. Although those hopes were realized, Merck also learned, and subsequently notified the public, that "significantly fewer thromboembolic events were observed in patients taking naproxen" than patients taking Vioxx. App. at 765. Merck suggested that naproxen's effect on platelet aggregation was responsible for this difference, but conceded that this hypothetical effect "had not been observed previously in any clinical studies . . . ." App. at 765. Merck also stated that all other Vioxx trials "showed no indication of a difference in the incidence of thromboembolic events between Vioxx, placebo and comparator NSAIDs." App. at 766.

Securities analysts and the press duly reported the results of VIGOR and the naproxen hypothesis. For instance, an article published in Bloomberg News a month after the VIGOR results were released reiterated Merck's hypothesis about naproxen's effect on platelet aggregation, but noted that "[n]aproxen doesn't

29

have documented protective effects on the heart," and quoted an analyst who stated, "that Vioxx increases cardiac risk . . . may be true, but it is far too soon to make that kind of judgment." App. at 2292. Similarly, a J.P. Morgan report from April 2000 noted the intuitive appeal of the theory that "the thromboembolic event issue is an 'NSAID-issue,'" but explained that the "theoretical cardiovascular protective benefits of Naprosyn . . . have not been clinically proven . . . ." App. at 2376. In another article, a spokesperson for the makers of Naprosyn stated, "[t]o our knowledge, naproxen does not prevent heart attack or stroke . . . ." App. at 2288. In our view, this category of disclosures does not constitute storm warnings that Merck misrepresented Vioxx's safety profile to investors in a manner that might give rise to a securities fraud claim. On the contrary, securities analysts and the press recognized the naproxen hypothesis for what it was, an unproven hypothesis, and recognized that there was an alternative hypothesis, "that Vioxx increases cardiac risk . . . ." App. at 2292.

Shortly before the AAC hearing, during which the FDA considered how Vioxx's labeling should be modified to incorporate the results of the VIGOR study, a J.P. Morgan research report described the effect of NSAIDs such as naproxen on CV events as "poorly proven" and explained that there was "no way to retrospectively slice the data to prove the NSAID benefit vs. Vioxx risk argument . . . ." App. at 2547. At that hearing, defendant Reicin, the Executive Director of Clinical Research at Merck Research Laboratories, who argued in support of the naproxen hypothesis, admitted at the outset that the explanation for the results of the VIGOR study was uncertain. The first Vioxx product liability lawsuit (which, incidentally, charged the makers of Celebrex with identical wrongdoing) followed shortly thereafter, seeking "additional medical labeling which is presently being considered by the FDA [in conjunction with the AAC hearing.]" App. at 1748. Of course, investors, unlike Vioxx patients, were presumed to be aware of the publicized outcomes of research studies, such as VIGOR, which underlay the allegations of that product liability lawsuit. See Benak, 435 F.3d at 401 (explaining that "a direct investor . . . can be deemed to have consistent knowledge of his or her securities holdings").

The JAMA article evaluated Vioxx and Celebrex, both COX-2 selective inhibitors, together; its findings were not limited to Vioxx. The article concluded, based in part on VIGOR, that "[c]urrent data would suggest that use of selective COX-2 inhibitors might lead to increased cardiovascular events." App. at 752. Of course, this is simply the alternative to the naproxen hypothesis. The JAMA article did not present any data that would suggest that Merck did not have reason to propose that hypothesis. Accordingly, it is of little surprise that a Deutsche Banc securities analyst described the types of questions raised in the JAMA article as "not new news . . . ." App. at 2749. Moreover, Merck issued reassuring statements the day before and the day after the article was published. Again, we are of the view that the JAMA article, taken on its own, did not constitute sufficient information of possible wrongdoing under the securities laws so as to raise a storm warning of culpable activity under the securities laws.

The FDA warning letter demands more scrutiny. In analyzing the effect of that letter through the prism of inquiry notice, we must not lose focus of the nature of the allegations in the letter and the scope of the FDA's regulatory authority. The FDA targeted Merck's "promotional campaign for Vioxx," App. at 713, under its authority to regulate prescription drug advertisements, see 21 U.S.C. § 352(n); see generally Pa. Employees Benefit Trust Fund v. Zeneca Inc., 499 F.3d 239, 248-49 (3d Cir. 2007) (discussing the FDA's authority over prescription drug advertising). The letter focused on three distinct components of the promotional campaign that the FDA found of concern: (1) six promotional audio conferences, presumably aimed at health care professionals such as doctors and pharmacists; (2) a press release dated May 22, 2001 entitled "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx," App. at 718; and (3) oral representations made by Merck sales representatives, again, presumably to health care professionals. The FDA chastised Merck's promotional campaign for "discount[ing] the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on" naproxen, and "selectively present[ing]" the naproxen hypothesis as the reason for the incidence of increased CV events. App. at 713. The FDA stated that Merck's promotional campaign

31

"fail[ed] to disclose that [its] explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties." App. at 713. For a number of reasons, we are hesitant to conclude that the FDA warning letter was sufficient to trigger inquiry notice.

To begin with, the FDA was acting as a regulator of drug advertising, rather than as a regulator of the securities markets. Thus, contrary to Merck's contention at oral argument, the FDA's actions are hardly analogous to allegations of accounting fraud issued by the SEC, which regulates the securities markets. Indeed, the FDA's drug advertising regulations and the securities laws provide wholly different standards with respect to what constitutes a misrepresentation. FDA regulations provide that advertisements must not be "lacking in fair balance," 21 C.F.R. § 202.1(e)(6), and prohibit advertisements that "[c]ontain[] a representation or suggestion that a drug is safer than it has been demonstrated to be by substantial evidence or substantial clinical experience . . . or otherwise selects information from any source in a way that makes a drug appear to be safer than has been demonstrated," id. § 202.1(e)(6)(iv). In contrast, under the securities laws, "a fact or omission is material only if 'there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the "total mix" of information' available to the investor." In re NAHC, 306 F.3d at 1330 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).

Second, the FDA's description of the truth about the VIGOR study is quite similar to the evidence that Merck had long acknowledged and which the market had incorporated. Specifically, the FDA stated that the naproxen hypothesis "is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties." App. at 713. This information is implicit in Merck's long-standing admission that the posited anti-coagulant effect of naproxen "on [CV] events had not been observed previously in any clinical studies for naproxen." App. at 765. On the basis of Merck's public announcements, securities analysts discussed the existence of "a 'Vioxx risk' hypothesis" over

32

seven months before the FDA warning letter was issued. App. at 2547. Indeed, the FDA did not charge that the naproxen hypothesis was wrong or that Merck did not believe in the validity of its hypothesis; rather, the agency simply directed Merck to be more clear about the widely known alternative hypothesis in its dealings with health care professionals and, presumably, consumers.

Third, two of the three components of the promotional campaign subject to the FDA's reprimand consisted of statements made to health care professionals in the course of targeted audio conferences and personal conversations. The third component of the promotional campaign targeted by the FDA was the press release, but that press release merely repeated the same information that was first contained in the VIGOR press release, i.e., "significantly fewer heart attacks were observed in patients taking naproxen . . . compared to the group taking Vioxx," "the VIGOR finding is consistent with naproxen's ability to block platelet aggregation by inhibiting COX-1," "[t]his is the first time this effect of naproxen on cardiovascular events has been observed in a clinical study," and "[o]ther potential explanations" for the results were possible. Press Release, Merck & Co., Inc., Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx(R) (May 22, 2001) (available on PR Newswire and LexisNexis).

Finally, we consider the effect the FDA warning letter had on the market. Merck's stock price dipped slightly following the disclosure of the FDA warning letter before closing higher than it did before that disclosure just a week and a half later. Although the lack of significant movement in Merck's stock price following the FDA warning letter is not conclusive, it supports a conclusion that the letter did not constitute a sufficient suggestion of securities fraud to trigger a storm warning of culpable activity under the securities laws. See, e.g., Berry, 175 F.3d at 705 (asserting that the "negligible impact" of an alleged storm warning on defendant's stock price bolstered conclusion that inquiry notice was not triggered). This conclusion is also supported by the fact that more than a half-dozen securities analysts continued to maintain their ratings for Merck stock and/or project increased future revenues for Vioxx after the warning letter was made public.

33

Merck also emphasizes the three additional lawsuits filed after the FDA warning letter. Of course, none of these lawsuits alleged securities fraud. Rather, they alleged consumer fraud, product liability, and personal injury claims. The claims in those lawsuits alleged that Merck failed to provide publicly available information to Vioxx consumers, rather than to Merck investors. Cf. In re Ames Dep't Stores, Inc. Note Litig., 991 F.2d 968, 980 (2d Cir. 1993) (stating that the different concerns of debt and equity holders may call for distinct inquiry notice dates for the two classes of investors).

Finally, we question the District Court's conclusion that the New York Times article constituted a storm warning. The District Court reasoned that defendant Scolnick's statements in that article constituted "a significant departure from Merck's company line as to the explanation for the VIGOR study results." In re Merck, 483 F. Supp. 2d at 420. But Scolnick did not abandon the naproxen hypothesis; rather, he reiterated that Merck "found no evidence that Vioxx increased the risk of heart attacks" when it looked back at its data comparing Vioxx to other drugs and placebos and "that 'the likeliest interpretation of the data is that naproxen lowered . . . the thrombotic event rate' . . . ." App. at 654.[15] Even in the wake of the FDA warning letter, then, Merck continued to reassure the investing public that Merck stood behind the naproxen hypothesis, while acknowledging that another explanation (i.e., that Vioxx causes CV events) remained a possibility. See Benak, 435 F.3d at 402 n.16 ("Reassurances can dissipate apparent storm warnings if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns.") (citation and internal quotation marks omitted). It is also notable there was no "significant movement" of Merck's stock price following the article's publication. Newman, 335 F.3d at 195. Thus, we cannot conclude as a matter of law that this article constituted a storm warning.

---

[15] The New York Times article also explained that "[t]he risk is hypothesized, not proved," and that "leading arthritis specialists . . . say that they are not concerned and that they prescribe the drugs for patients who may have heart disease." App. at 653.

34

In summary, we conclude that the District Court acted prematurely in finding as a matter of law that Appellants were on inquiry notice of the alleged fraud before October 9, 2001. As of that date, market analysts, scientists, the press, and even the FDA agreed that the naproxen hypothesis was plausible, at the very least. None suggested that Merck believed otherwise. Accordingly, in April 2002, the FDA approved a labeling change for Vioxx which stated that "[t]he significance of the cardiovascular findings [from the VIGOR study] is unknown." App. at 553. Merck continued to reassure the investing public at this time, explaining that the naproxen hypothesis was "a position Merck has always had and now its [sic] quite clearly laid out in the labeling." App. at 559. On the record before us, there is no reason to suspect that Merck did not believe the naproxen hypothesis until the Harvard study in 2003 revealed an increased risk of heart attack in patients taking Vioxx compared with patients taking Celebrex and placebo. This study for the first time belied Merck's repeated assurances that naproxen was responsible for the disparity in CV events in VIGOR and that Vioxx did not have a higher incidence of CVs compared to placebo or comparator NSAIDs, such as Celebrex.[16]

---

[16] There are two statements in the dissent, although arguably going to minor issues, that call for a response. The dissent states that Scolnick's statement quoted in the October 9, 2001 New York Times article was "the first time [the statement that the VIGOR results could be explained by either the effect of naproxen or Vioxx] had been made by the company." Dissent Typescript op. at 46-47. In fact, as noted above, Alise Reicin, the Executive Director of Clinical Research at Merck Research Laboratories, had testified as to that possibility at the FDA's hearing before the AAC as early as February 8, 2000, more than eight months before the New York Times article. See supra p. 7.

Second, to the extent that the dissent suggests that the majority holds that fluctuations in stock price and analysts' ratings and projections are necessary to a finding of storm warnings, Dissent Typescript op. at 47, a rereading of the majority opinion will make clear that the majority agrees with the dissent that such factors are relevant to the storm warnings inquiry, but not required.

## V.

## Conclusion[17]

For the reasons set forth, we will reverse the judgment of dismissal and remand to the District Court for further proceedings consistent with this opinion.

See supra p. 28.

It is ironic that the dissent, although noting what might be viewed as Merck's misrepresentations, would apply the statute of limitations to deprive plaintiffs of the opportunity to prove a viable case against Merck for such misrepresentations.

[17] Because we have concluded that the District Court erred in finding Appellants on inquiry notice of the alleged fraud at this stage of the litigation, we do not address Appellants' remaining arguments regarding the claims of plaintiffs who purchased stock after October 9, 2001 and the viability of Appellants' section 20A claims.

36

*In re: Merck & Co., et al.*

Nos. 07-2431/2432

---

**ROTH,** Circuit Judge, dissenting.

I believe "storm warnings" alerting a reasonable investor of *possible* culpable activity on the part of Merck were evident more than two years prior to the filing of appellants' complaint. In particular, I believe that the FDA's September 17, 2001, warning letter, in and of itself, provided sufficient "storm warnings" to put the appellants on inquiry notice of their claims regardless of any significant change in stock price or analysts' stock ratings or projections at that time. I therefore respectfully dissent.

Under the "inquiry notice" test, the statute of limitations for securities claims "begins to run when the plaintiffs 'discovered or in the exercise of reasonable diligence should have discovered the basis for their claim' against the defendant." *Benak v. Alliance Capital Management L.P.*, 435 F.3d 396, 400 (3d Cir. 2006) (*quoting In re NAHC, Inc. Securities Litigation*, 306 F.3d 1314, 1325 (3d Cir. 2002) (citations omitted)). In order to establish that plaintiffs were on inquiry notice, a defendant must demonstrate that, as of a particular date, there existed "storm warnings" sufficient to alert "a reasonable investor of ordinary intelligence" to "*possible* wrongdoing" on the part of defendants. *Id.* (*quoting In re NAHC*, 306 F.3d at 1325) (explaining that the question is whether plaintiffs had

37

"sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity") (emphasis added).

Furthermore, it is well established that "[t]he existence of storm warnings is a *totally objective* inquiry[,]" that is based on whether a "reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning[,]" *Mathews v. Kidder Peabody & Co., Inc.*, 260 F.3d 239, 252 (3d Cir. 2001) (emphasis added); *see also In re NAHC*, 306 F.3d at 1325. We do not require that plaintiffs "know all of the details or 'narrow aspects' of the alleged fraud to trigger the limitations period[,]" but rather "the period begins to run from the time at which plaintiff should have discovered the general fraudulent scheme." *In re NAHC*, 306 F.3d at 1326 (internal quotations and citations omitted). Most importantly, we recognize that triggering data for "storm warnings" may include any information that would alert a reasonable investor to the *possibility* that the defendants engaged in the "*general fraudulent scheme*" alleged in the complaint. *Id.* (emphasis added). Finally, such triggering data must "relate[] directly to the misrepresentations and omissions alleged." *DeBenedictis,* 492 F.3d at 217-18 *(quoting Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 171 (2d Cir. 2005)).

In applying the above inquiry notice standard to the instant case, I am reminded of a classic fairytale: *The Emperor's New Clothes*, by Danish author and poet, Hans

38

Christian Anderson.[18]  As the child in *The Emperor's New
Clothes* saw – that the Emperor walked naked down the street –
any reasonable investor reading the FDA's September 17, 2001,
warning letter could see the problem with Vioxx – the
misrepresentation of its safety profile and the "possibility" that
Merck had fraudulently misrepresented the cardiovascular safety
of its "blockbuster" product.  The warning letter to Merck,
which was published on the FDA's public website, stated in
pertinent part:

> *You have engaged in a promotional campaign for*

---

[18]In the story, two swindlers approached the Emperor,
falsely claiming the ability to make beautiful clothes from cloth
that could be seen only by those individuals fit for their positions
or who were not imbecils.  The Emperor immediately hired them.
Word spread throughout the city about the unique quality of the
cloth and the personal characteristics that an individual must
possess to see clothes made of such material.  After the swindlers
finished weaving the Emperor's new clothes and presented them to
him, neither the Emperor nor his most trusted servants would admit
that they could not see the clothes for fear of appearing unfit or
stupid.  Instead, each exclaimed that the clothes were beautiful.
Donning his new clothes, the Emperor walked in a procession
through the city's streets.  The townspeople also feared looking
stupid in their neighbors' eyes.  Like the Emperor and his servants,
they proclaimed that the clothes were the most beautiful they had
ever seen.  It wasn't until a child exclaimed, "But, Daddy, he has
nothing on!" that the crowd realized that the child spoke the truth.

*Vioxx that minimizes the potentially serious cardiovascular findings* that were observed in the [VIGOR] study, and *thus, misrepresents the safety profile* for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator [NSAID], Naprosyn (naproxen).

Although the exact reason for the increased rate of MIs observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. *You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin.* That is a possible explanation, but *you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.*

...

Your *minimizing* these potential risks and *misrepresenting* the safety profile for Vioxx *raise significant health and safety concerns.* Your *misrepresentation* of the safety profile for Vioxx is *particularly troublesome because we have previously, in an untitled letter, objected to*

40

*promotional materials for Vioxx that also misrepresented Vioxx's safety profile.*

...

We have idenitified a Merck press release entitled, "Merck Confirms Favorable Cardiovascular Safety Profile of VIOXX," dated May 22, 2001, that is also *false or misleading* for similar reasons stated above. Additionally, *your claim in the press release that VIOXX has a "favorable cardiovascular safety profile," is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading*; in fact, serious cardiovascular events were twice as frequent in the VIOXX treatment group (101 events, 2.5%) as in the naproxen treatment group (46 events, 1.1%) in the VIGOR Study.

App. at 713-14, 718 (emphasis added).[19]

---

[19] Also in the warning letter, the FDA identified specific statements made by Merck in promotional audio conferences and by Merck's sales force demonstrating Merck's minimization and misrepresentation of the increased heart attack rates of Vioxx-taking participants in the VIGOR study and several unsubstantiated superiority claims made by Merck about Vioxx. App. at 715-16, 718-19. Finally, the warning letter concluded with a corrective action plan which required Merck to issue a "'Dear Healthcare provider' letter to correct false or misleading impressions and

41

The warning letter *clearly and explicitly* reprimanded Merck for its (1) deceptive and misleading conduct in publicly endorsing the naproxen hypothesis as the sole explanation for the higher rate of cardiovascular events in VIGOR study participants taking Vioxx, *despite* knowing that any purported cardiovascular protective effect of naproxen was unproven, and (2) downplaying of potential safety problems in failing to disclose the possibility that Vioxx increases the risk of heart attack. As the letter explained, this was *not* the first time the FDA had charged Merck with misrepresenting Vioxx's safety profile. The language used in the letter was particularly strong and indicated the FDA's significant concern for the public's health. Also, the warning letter cannot be said to have constituted mere speculation, but was rather a formal report of "objective wrongdoing." *See Benak*, 435 F.3d at 402 (explaining that, in determining whether a plaintiff has inquiry notice, "[s]peculation should not be given the same weight as reports of objective wrongdoing"). Furthermore, the warning letter was published on the FDA's website where it would have been discovered by a reasonable Merck investor. *See In re NAHC*, 306 F.3d at 1325.

Moreover, the charges in the warning letter relate directly to the misrepresentations and omissions alleged in the appellants' complaint: that the company and certain of its officers and directors intentionally misrepresented the cardiovascular safety of Vioxx and, consequently, the impact that Vioxx would have on Merck's financial health. *See DeBenedictis*, 492 F.3d at 217-

information." App. at 719.

42

18; *see e.g.,* Amended Complaint*,* App. at 468 (stating that "Defendants made... materially false and misleading statements and omissions concerning... the safety profile of... VIOXX"); App. at 470 (stating that "Defendants misrepresented the safety profile of VIOXX, including concealing and minimizing the significantly increased risk of heart attacks in patients taking the drug"); App. at 482 (describing a "wrongful scheme... which included the dissemination of materially false and misleading statements and concealment of material adverse facts"); App. at 497 (stating that "Defendants falsely conditioned the market to believe VIOXX was safe"). Accordingly, I believe that the FDA's warning letter to Merck sufficiently alerted a reasonable investor to the *possibility* that Merck fraudulently misrepresented the cardiovascular safety of Vioxx – its "blockbuster" product.[20]

---

[20]It is important to note that Merck's reliance on its naproxen hypothesis was proved to be unfounded from the beginning. Even before the FDA's warning letter was issued, an April 27, 2000, *Reuters* article reported that (1) a spokesperson for leading naproxen manufacturer, Roche Holding Ltd., explained that "[t]o [their] knowledge, naproxen does not prevent heart attack or stroke" and (2) an ABN Amro analyst indicated that "[m]edical authorities [he had] spoken to don't see any special reduction of such cardiovascular events in people taking naproxen." App. at 2288. Additionally, an August 21, 2001, *Bloomberg News Article*, reported a Merck representative's comment that "[Merck] already ha[s] additional data beyond what [the *JAMA* article] cite[s], and the findings are very, very reassuring. VIOXX does not result in any increase in cardiovascular events compared to placebo." App. at 539. Even if this "additional data" included evidence that could

43

Even assuming that the FDA's warning letter alone did not sufficiently excite "storm warnings," the total mix of information in the public realm which followed the warning provided more than adequate "storm warnings" to put appellants on inquiry notice.

In response to the FDA's warning letter, there was widespread media and financial analyst coverage commenting on the FDA's charges against Merck, with some reports noting that such warnings are reserved for the more serious offenders. *See e.g.*, App. at 2353 (*Reuters*, September 24, 2001) (reporting that "U.S. Regulators have charged... Merck... with misleading doctors about its blockbuster painkiller Vioxx with promotions that downplayed a possible risk of heart attacks"); App. at 2752 (*Merrill Lynch*, September 24, 2001) (stating that "[t]he FDA issued a warning letter to Merck... [and] is looking for Merck to cease all violative promotional activities... . We do not see how this... can be helpful to Merck in promoting Vioxx"); App. at 2355 (*USA Today*, September 25, 2001) (reporting that "Merck's marketing efforts... have minimized Vioxx's known and potential cardiovascular risks, the FDA wrote in an eight-page 'warning letter'... . So far this year, the FDA has sent drug companies fewer than a dozen warning letters, which the agency reserves for activities that raise significant public health concerns"); App. at 2768 (*UBS Warburg*, September 25, 2001) (stating that the "FDA [has] issue[d] [a] warning to Merck for marketing only one side of the Vioxx safety argument... . Merck was cited several times

support Merck's naproxen hypothesis, Merck never revealed the details of its purported "additional data."

44

for promoting the story that the outcome of the VIGOR study was due to Naproxen being cardioprotective and that there is no unusual cardiovascular safety risk with Vioxx."); App. at 2360 (*Associated Press*, September 25, 2001) (reporting that "Merck has argued that [the VIGOR study results make] Vioxx falsely look[] risky because naproxen thins the blood... and thus protect[s] against heart attacks... . 'In fact, the situation is not all that clear,' [according to] the FDA"); App. at 2757 (*Credit Suisse First Boston*, September 25, 2001) (stating that "the FDA [has] issued a warning letter citing Merck with making misleading statements in the promotion of... Vioxx"); App. at 2361 (*The Wall Street Journal*, September 25, 2001) (reporting that "Federal regulators warned Merck & Co. for improper marketing of its blockbuster arthritis drug Vioxx, saying the company had misrepresented the drug's safety profile and minimized its potential risks[,]" and "[w]hile the FDA sends out dozens of routine citations annually, it issues only a handful of these more-serious warning letters each year"); App. at 2363 (*The New York Times*, September 26, 2001) (stating that "[t]he [FDA] has ordered Merck & Company to cease promotions intended to persuade doctors to prescribe its arthritis painkiller Vioxx, saying the promotions minimize potential risks"). Even appellants themselves recognized in their complaint that "FDA Warning Letters are sent only to address serious circumstances." App. at 1280.

Furthermore, in addition to the first lawsuit filed before the FDA's warning letter, three product liability and consumer fraud actions had been filed in September and October 2001, all alleging that Merck had misrepresented the cardiovascular safety of Vioxx. *See* App. at 1748 (May 29, 2001, product liability

45

class action alleging that "Merck's own research [demonstrated that] users of Vioxx were four times as likely to suffer heart attacks as compared to other less expensive medications..., [but that] Merck... [took] no affirmative steps to communicate this critical information to class members"); App. at 1557 (September 27, 2001, consumer fraud class action alleging that "Merck [had] omitted, suppressed, or concealed material facts concerning the dangers and risks associated with the use of Vioxx, including... cardiovascular problems... [and] purposely downplayed and/or understated the serious nature of the risks associated with Vioxx"); App. at 1574 (September 28, 2001, product liability and consumer fraud action alleging that Merck had "misrepresented that Vioxx was... safe and effective..., when in fact the drug causes serious medical problems such as an increased risk of cardiovascular events, including strokes, heart attacks and death"); App. at 1611 (October 1, 2001, product liability action alleging that Merck failed to "[]disclose[]" that "Vioxx causes heart attacks"). While these law suits did not allege *securities* fraud, the general allegations contained within these complaints relating to Merck's intentional misrepresentation with regard to Vioxx's safety similarly formed the basis of appellants' complaint.

Moreover, *The New York Times* article, dated October 9, 2001, quoted defendant Scolnick as explicitly stating that "[n]aproxen lowers the heart attack rate, *or Vioxx raises it*." App. at 2367 (emphasis added). Based on my review of the record, this express acknowledgment by a Merck representative of the possibility that Vioxx actually raises the risk of heart attack appears to be not only the first time such statement had been made by the company, but also in stark contrast to Merck's prior

46

representations. Therefore, because of what I perceive to be significant media and financial analyst attention directed at the explicit and serious nature of the FDA's warning letter, the allegations in the multiple lawsuits which followed, and Merck's change of tone in the October 9, 2001, article, I cannot see how a reasonable investor could not be aware of the *possibility* that Merck had been fraudulently misrepresenting the cardiovascular safety of Vioxx.

Because the objective evidence indicated the possibility of culpable activity on the part of Merck, a lack of significant stock movement and decreases in analysts' stock ratings and projections *do not negate* a finding of "storm warnings" under our inquiry notice standard. Appellants argue that "storm warnings" could not have existed prior to the 2003 Harvard Study because the total mix of public information did not have a negative effect on the price of Merck stock or cause analysts to drop their ratings for Merck or lower their projections for Vioxx sales. It is true, as the majority points out, that our past inquiry notice decisions have taken into consideration the market's response to disclosures alleged to constitute "storm warnings." However, I do *not* believe the law *requires* that, in order to make a determination that "storm warnings" in fact exist, the total mix of public information (purported to constitute "storm warnings") *must* have a negative effect on stock prices or cause analysts to drop their ratings or lower their projections. *See Benack*, 435 F.3d at 400 ("information [need only suggest] *possible* wrongdoing... to excite 'storm warnings'") (*quoting In re NAHC*,

306 F.3d at 1325) (emphasis added). As we recognized in *In re NAHC*:

47

[S]torm warnings may take numerous forms, and we will not attempt to provide an exhaustive list. They may include, however, substantial conflicts between oral representations of the brokers and the text of the prospectus, ... the accumulation of information over a period of time that conflicts with representations that were made when the securities were originally purchased, *or any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made*.

306 F.3d at 1326 n.5 (*quoting Mathews*, 260 F.3d at 252 (internal citations and quotations omitted)) (emphasis added). In my view, fluctuations in stock price and analysts' ratings and projections, although relevant, are *not* a *required* consideration in this circuit's objective "storm warnings" analysis. Here, the lack of a significant response from the market to the FDA's warning letter does not mean that the Emperor was not walking down the street with no clothes on. It merely means that the analysts saw the emperor's new clothes as Merck described them – not as reality presented.[21]

---

[21] Regardless, Merck's stock price did decline sharply in the months leading up to October 9, 2001, as the public controversy about Vioxx raged. From January 1, 2001, to October 9, 2001, Merck's stock price declined by $24.32 or 27.4% App. at 1770-73. As appellants themselves alleged, "Merck's stock price began its slide in approximately *January of 2001, and continued and*

Based on the foregoing, I submit there were sufficient "storm warnings" more than two years prior to the filing of appellants' complaint. At a minimum, I believe the FDA's September 17, 2001, warning letter constituted more than sufficient "storm warnings" to put appellants on inquiry notice of their claims, particularly since appellants fail to demonstrate either that they conducted a diligent investigation within two years of the accrual of such "storm warnings" or that they were unable to uncover pertinent information during that time period. Accordingly, because appellants waited over two years to bring suit, I conclude that their claims were filed out of time and were properly dismissed by the District Court.

---

*worsened after August of 2001* when the VIGOR cardiovascular data was presented more fully in the [JAMA article]." App. at 1225 (emphasis added).